with us. Thank you. Judge King, members of the panel, may it please the court. I'm Richard Hawkins. I'm here this morning on behalf of the plaintiff, appellant Eva Palmer, who's also the cross appellee. We begin this morning with Ms. Palmer's age discrimination claim. And your honors, this is a case that should have gone to trial. This is a case where I should have been allowed to stand in front of a jury and say, ladies and gentlemen, Eva Palmer, a 32-year veteran of Liberty University who was terminated at age 79 just one year after being promoted to the highest position available to her at the university, was a victim of unlawful age discrimination. What is your best evidence that Liberty's legitimate, non-discriminatory reason for discharging her, for not renewing her, is pretextual? Best evidence that it's pretextual. There's three pieces that go together, but I think the best is the promotion itself. And it's the promotion that is contextually connected and intertwined with guidelines that Liberty itself set forth that required excellence in teaching. And Liberty, of course, testified in its deposition that a promotion is evidence of excellence in teaching. And if there had not been excellence in teaching, Ms. Palmer would never have been promoted. And the reason that the promotion is the best evidence is because in all of the years prior to that promotion, the criticism that was the justification for the termination or the non-renewal, the, quote, legitimate expectations or the legitimate, non-discriminatory reason was her failure to meet digital literacy criteria. And these were criticisms that had been raised every year. So you, it's your position that she has now met those requirements and that's why she was regarded as, said that their things are pretextual, that their reason for not renewing her is pretextual? I'll be a little bit more nuanced. The record didn't read to me as if she had met those requirements. I take a more nuanced view of that because what I'm saying is that, because in order to show a reason is pretextual, we can also show that it is illegitimate and that it is not genuine. And when somebody has been told year after year after year that you're not meeting this criteria and then they get promoted based on criteria that include these prior criticisms, then to then terminate that person the year later based on those criteria is not legitimate. That shows pretext. That shows that it was not the reason. Help me understand that. Say that one more time. Your argument is that it can be the true reason that in fact she could not do digital arts, she was unable to teach it, and that if we had the truth serum, we could talk to the dean and the dean would say that I fired her for that reason. And that can be all true in your view. And you still prevail because you think digital arts is illegitimate and unnecessary at Liberty. No. I'm not. Help me understand what you're saying. It seemed like what you were saying is that can be true, but I'm going to decide that digital arts is illegitimate and unnecessary. No. The illegitimacy is the explanation itself. It is one thing to say you don't have digital arts skills, and we will concede that she did not attain certain levels of digital literacy. But that is not a legitimate basis on which to non-renew her. And the proffering of that reason Can you tell me what you mean by legitimate in that sense? Legitimate seems to me true, but not valuable, right? What you're trying to say is true, but not valuable, right? So that is the reason that she was fired, but they shouldn't be able to do that. And that goes back to the suggestion that you're saying, well, they just don't really matter. Well, it's not that they shouldn't be able to do that, but they shouldn't be able to use that reason as a mask to cover age discrimination. And we say that it's a mask, that it is not the legitimate reason. It's not the actual motivation for why they terminated her or why they non-renewed her. Because if you look at all of the preceding years, she had been performing at a level that was allegedly deficient, and then she gets promoted, which wipes the slate clean. Which means that that can no longer be the legitimate basis. To say that makes it illegitimate. It is factually correct in the sense that they say you needed to meet this requirement, you didn't meet this requirement. But it is not a legitimate basis upon which to base a non-renewal when there is so much other evidence, which we've identified here with regard to the criteria for the promotion, that underlies that. So as I understand, you're using the word legitimate to mean true. Yes. But true as in motivation. Not true as in a fact point of I say you need to wear red and you don't wear red, so you didn't wear red. And then I say, well, you're now blind, is that you're 79 years old. Well, what if subsequently you hire people that all wear red? Doesn't that give you some suggestion that the red requirement was in fact? Except they didn't. Chris Phillips, who is the professor, is the person who ended up not doing any of these digital literacy proceedings. The new people that were hired couldn't do digital? They could. But the point that was, the justification for this requirement being of such importance and of such a critical metric to require termination, to require non-renewal, was that it was, you know, they had a shifting dynamic in the classroom. They had a, you know, motivating students were now more interested in these particular classes. And you doubt that? I do. I do. And the doubting comes from the post-semesters. You look at the record. It's 1413, 1419, 1418, 1416. Those are the classes that were taught. And Chris Phillips had these alleged crossover skills. It's not just that you had the skills. It's that they were important for crossover teaching. But Professor Phillips didn't do any crossover teaching. And that for her non-renewal. So again, it's the promotion that's the starting piece. But then you look at the subsequent pieces of what happened after the fact. And they did not hire people who were read in that particular context. And Your Honor, I've tried to think about what could I say this morning that you haven't already read in the briefs. And there's not a whole lot that can be said except that I would say Sempowich, Sempowich, and Sempowich. Because that case has almost precisely the type of pre-termination negative evidence and pre-termination positive evidence that gets balanced. And it undermines the employer's legitimate justification or alleged legitimate justification. And this court said, and the case was decided literally five days or nine days before Judge Moon issued his decision. Obviously if we'd had it front and center we would have raised it immediately. But we think that the analysis in Sempowich calls into question the legitimacy of an employer's actions. And of course in that case the sales representative or the sales team leader had missed all of these sales goals. And had conceded that she had missed the sales goals. But they had rated her well. And they had rated her in a way that made her think that she was doing well. And so against the balance, and then they said, well, you're not doing well. You need to be transferred. They had also told her, or the evidence in that case was also that they had never told her that if she failed in her sales quotas or in her sales expectations that she would be reassigned. That's the same evidence we have here. And this court said that if an employer genuinely believed that the employee was failing on certain metrics that it believed were critical, then it shouldn't have all these other pieces of positive evidence. It shouldn't have given her a raise. It shouldn't have given her positive ratings. And the same is true here. If Liberty had truly believed that a lack of digital literacy skills or crossover skills was a genuine basis for non-renewal, then it never should have promoted her in the first place. And it never should have given her an almost $30,000 raise. And it never should have rated her meets expectations, again, which calls into question the legitimacy of the criteria, on digital literacy the year it told her that she was not meeting those expectations. Those are the counterbalancing pieces of evidence that a jury is required to consider. And we submit that both the pretext question and the issue of legitimate expectations cannot be decided on this record as a matter of law. And I invite the court to look not only at the simple which opinion, of course, from this court, but the district court's opinion in that case was some 23 pages at least. And it is chock full of details. It is robust in the factual information provided by the employer in that case. And it looks almost identical to what we have here. And that evidence wasn't good enough to be ruling as a matter of law. And that's our position here, that you cannot rule as a matter of law on those cases. The evidence of discrimination, the comments from Dean Hayes and the selection of retirement by Chair Smith. Well, I don't think you actually, I understand what you're saying about Semowich. But the facts were very different. Very different. And I know Your Honor was the author of that decision. But the facts were different in the court. I do believe that they are sufficiently similar. The employer had rated her very high. Correct. Higher than other employers. I don't see any other employees. I don't see any evidence of that in this record. It repeatedly gave her awards, including one for sustained excellence three weeks before it told her that it would reassign her position. Correct. I don't see any evidence of that in this record. Told her that he would give her a salary raise three weeks before it told her it would reassign her position. And gave her a discretionary equity grant 12 days before it told her that it was going to reassign her. Correct. There's no evidence like any of that in this record. The issue to that is timing. But you look at the timing we have here. No, it's also additional approval. Even monetary approval. But look at the approval we have here. In the fall of 2016, Palmer is promoted. She is now deemed full professor. They celebrate her in January of 2017. This is less than a year before they let her go. In June, she signs the new contract. That's her $30,000 raise. And this is less than four months before they let her go. Is there any discussion of giving her awards that make her superior to other people? No, there's just not. The records are just, I understand why you're relying on it. But the cases are very different. I'll Sometimes you can recover on a cause of action. It's the same cause of action, but you can't recover on it under other facts. I mean, that's just life. I totally agree, Your Honor. But what I will say, though, and this is a comparative point that I do think is worth emphasis, is that the promotion is the synchrone of what's going on here. It is evidence of excellence in teaching. So, no, they didn't compare her to others per se, but they gave her the highest possible rank available at the university. They could not go any higher. They couldn't award her anything more in terms of her rank, and they did it less than a year before they decided they couldn't have her anymore. And it's our position that that is with the other evidence that we have here. Your Honor, I'm misunderstanding the record. I thought that the discussion all along was that she had to get this digital stuff under the belt, and she had to be able to teach it. And when they gave her whatever it is you were talking about, the promotion or the – they said that then, too. And that was the agreement. And she never did it. No, but they gave her the promotion anyway. And the point is, you shouldn't give But the hope was No, I don't believe it's the issue of hope. That is where I think the analysis goes astray, Your Honor. I think they say you need to do this. And then the question is, is what you've done sufficient? Not is it, you know, over the top. Is it Well, who determines that, the employee or the employer? The employer, and they did. They rated her as meets expectations, and then they said she is promoted, which means that she satisfies their expectations, and that covers everything, including the digital literacy. So that's our position. I see that I am out. I will reserve. Thank you. Thank you very much, sir. Mr. Tower? Thank you, Your Honor. My name is King Tower, and I'm here with Leah Stiegler from my firm and David Corey, General Counsel. Your Honors, we are here today to discuss two issues. We will address the discrimination in the Employment Act issue. And just to refresh your recollection about the posture procedurally, Judge Moon was presented with cross motions for summary judgment first on the ministerial exception issue, whether Ms. Palmer should be a minister under the Supreme Court precedence. He denied Liberty's motion, granted Ms. Palmer's motion for summary judgment, so the case continued, and then we moved for summary judgment on the merits of the ADEA case, and he granted that. Your Honors, of course, our position is that he granted Judge Moon conducted an oral argument with you all? A virtual oral argument, yes, sir. And in that matter, we presented then, as we do now, a case with And you discussed both these issues? We did these in serial, although they were very close in time. The summary judgment motions, cross motions were argued first on one occasion, and then on a separate occasion, we came back on the merits. Okay. And Can I, sorry to cut you off, but we've got a handful of things to run through. So I take your argument to be a pretty good one, at least in front of a jury, right? Like we said, digital arts, they should do it. It seems like a credible story. I get it. The rub that I'm having is maybe a little bit of the standard that we have at summary judgment, because there do seem things that cut against it, and Judge Motz points out our simple-witch decision. I mean, there are some significant differences there, but the question I'm at given what we've got, the retirement statement, Dean Haynes statements, and I get you can explain those, but I've got to take them in the light most favorable, right? And the prior promotion to what I think of as full professor, I'm not sure that's the actual title, but you get the idea, that included this excellence in teaching that had this sort of review aspect about digital performance, and I get that you've got explanations for those too, but what I'm having a little trouble doing is sort of saying that that's not a jury question, and I'm not sure which it is, but I want to get your take on, given that there are some cross-cutting sort of currents here, why do you think those two in particular, the sort of doesn't look good, right? Dean Haynes statements, right? Might well be able to explain those, but they don't look great, and the same thing with respect to you just gave her the big, what they want to characterize as the big promotion the year before. Right. Well, thank you, Your Honor. So, I'll address those issues. I mean, I think the first thing I'll say is that the standard does not, under Rule 56, require that there be no dispute as to the evidence, and so if a reasonable jury could not conclude, based on the evidence that the plaintiff should win, then summary judgment is appropriate, and our position is that, number one, while you do review the evidence in the light most favorable to the plaintiff, you still may only take those reasonable inferences from what's there, and I'll talk right in just a minute about what's there, but our position is that even if you resolve any dispute in favor of the plaintiff, if you take reasonable inferences from the few facts that you've talked about, there is just not nothing there that a reasonable jury could base a verdict on and form a plumber. He says the promotion is the smoking gun. Well, yes, Your Honor, and I think that Mr. Hawkins has this phrase of that that wipes the slate clean, that somehow being promoted in the 2016-2017 school year means that nothing else can happen. I'm not sure for how long that immunity lasts, but nothing... It's a big deal at a university to be promoted to a full professorship. It is, and it is, rank is important, and the professors themselves certainly feel that way, and she had been trying to get this rank increase... So explain to us what your argument is then. Right, so my argument is this, that first off, these are two different decisions. For one thing, a promotion decision is made based on this review of that particular individual's performance, and in this case, the undisputed evidence from the managers is that what they really were emphasizing with her was if you want this promotion, you've got to... It's a must that you have create some new artwork, and she did that, and frankly, maybe they shouldn't have promoted her, but they did, even though she didn't achieve these digital skills issues. But wasn't there evidence that the digital skills were part of the calculus, right? That's why she'd been denied before, and so wouldn't we infer that that's why she got it this go-around? Well, I don't think you have to infer, because we... Well, we don't have to infer, right? Again, I don't have to infer, and you've got a good argument. I understand that, but in this context, right, where there is an inference... I think you could take an inference that she at least did enough when you combine it with all the other categories that promotion is based on that they made a decision to go ahead and give her that promotion at that time, but the decision they were making over a year later when they're deciding about whether or not to offer a contract for even another year, hence, is not purely based on what Ms. Palmer's performance has been. It is a holistic view of what are the university's needs, what are students asking for. Students are more and more, and this is undisputed testimony on the record, students are seeking out these digital art classes. They are creating a situation where the university needs professors who have the versatility to teach those classes as well as the studio art classes that Ms. Palmer taught. And so this is why she'd been repeatedly told every year just about from 2013 forward, you need to improve in these areas in order to make yourself more versatile so that we can teach the classes we need to teach. And the testimony is they were having trouble even coming up with a teaching load for her because of her lack of versatility. And so I'm not saying there's no tension between the fact that she got a promotion, but I think it's important to remember that the same people who recommended her for a promotion are the people who are supposedly harboring this age-based animus just a year later. And this is not a retaliation case where there's some sort of protected activity that happens after the promotion and so it raises this inference that the management said, well, aha, we're going to punish you for that. This person was in this protected class all along. I mean, she was 78 years old versus 79 years old at these two points in time. So the judge, I think, correctly viewed that as really limiting any inference you can draw from the fact that the managers did decide to give her a promotion during this other time. And I do want to address, Judge, also your comment about the or statement about the comments because it's really not even a comment. There is a chart that was created for the three people who were being selected for their contracts to be non-renewed and there was a column and one of them said retiring or retirement at the top. That was it. This was after the selection. That says something. You can call that not a comment. I would call it a comment, right? There's a column. Maybe it's a column, but it sounds like a comment in a column, right? Somebody put it there. Oh, yeah. No, they... And the people that weren't old, they didn't put it there. Well, they didn't. Excuse me, aged? I don't want to be... Sorry, I didn't mean to use the word old. Why are you looking over here? No particular reason, but... Well, then. Whatever the right word for old is, they didn't get that. That word was put on that chart by the Liberty managers. You're absolutely right. So what is your argument about that? My argument is that that is not tantamount to going to an employee and saying, aren't you ready to And as was pointed out, the explanation, when you look at the, again, undisputed evidence, is that the reason that was done is that sometimes employees who are selected for non-renewal, if they're of retirement age, will ask, can I announce this as my retirement rather than it being a non-renewal? But it doesn't say retired, question mark. It doesn't, no. And ultimately, Ms. Palmer didn't bring that up, and so it was just really no reasonable inference there that age was even being considered other than the fact that, yes, she was of an age where she might have been somebody who raised their hand and said, can I announce to my colleagues that I'm retiring rather than have this be a non-renewal like anyone else? Can I ask you to shift gears just a minute? I want to make sure we get to it. You obviously made the ministerial exception argument first, and we've got them both before us now. And I'm a little confused about how the best way to go about resolving them. I think we can resolve it on either ground. But I wonder if you have a comment on the suggestion that, based on Lady of Guadalupe and Hosanna Tabor, where the court said that judicial review of the way to discharge responsibilities with respect to teachers and educators, that just that review at all And so whether there ought to be, purely as a matter of prudence or discretion, that if it's close, if what we've got here is like something that we're going to have to actually review the decision making, that in fact we ought to address the ministerial exception first to avoid intertwining ourselves. And if it turns out that the person's a minister, that we avoid intertwining ourselves or second-guessing, as Hosanna Tabor said, a religious institution with respect to their messengers. Well, I think that's right. And in this case, obviously, there's no real dispute about whether it's a religious institution. Maybe that will be an issue in some cases that come before you. It's not really now. The faculty member, we're not here today to argue for a categorical statement that a ministerial exception applies to anyone who is a faculty member. But you're right that there is some difficulty in even approaching the issue from the court's perspective if the rule should be that there is too much entanglement if the court gets involved in determining how these duties are carried out. So you're right that if there is some sort of violating the First Amendment or having the case go forward. And one thing that I'd point out here is that if this is jurisdictional, then the university should have been exempt from being sued. Let's assume it's not jurisdictional. Okay. I think that's a safe assumption for you. Even from a judicial economy standpoint, our position is that the initial summary judgment motion on the grounds of the ministerial exception should have been granted at that point. And we point out that in review... It should have been considered first and granted to the person who'd ever get to the ADA claim. That's correct, Your Honor. Have you ever heard of Ashwander? Pardon me? Have you ever heard of Ashwander? I have heard of it, Your Honor. Know anything about Ashwander? That's Supreme Court. Right. That's way up there. Yes. Supreme Court Ashwander decision, I think it's 1936. And this is trying to avoid deciding issues that you don't have to decide? It says we don't decide constitutional issues if we can resolve the litigation on non-constitutional issues. Right. That's the Ashwander principle as I understand it. Right. And that's summing it up in a few words. But the Supreme Court said... And a lot of people call it the constitutional avoidance doctrine. Right. And particularly as the appellate court, as you approach this case, you may decide, we are just going to decide this on the ADEA because the judge got it right and we're going to affirm and that's the end of it. Our argument here today is that you also address ministerial exception for the reason that it is sort of like the exception to mootness. It is likely to recur. This university is a religious institution in this district. The judge obviously doesn't believe it applies to faculty members under these circumstances. If you disagree, our argument would be that that would be something that would be helpful and allow the courts to dispose of cases in the first instance if a minister or someone who is a minister under Our Lady of Guadalupe comes forward and attempts to invoke one of the other employment laws. What religious interest would be advanced if we apply the ministerial exception? Well, I think it's the autonomy is the key word. It's the right of the court of the religious institutions of the country to carry out their affairs without having the federal government or any government interfering in who they select for these certain positions. And the courts have made it clear that if we're talking about positions... But you stuck in there with their religious mission. So what does the non-renewal of Ms. Palmer's contract as an art professor have anything to do with Liberty's religious mission? I see what you're saying, Your Honor. Yes, and I know that early on in the development of the ministerial exception, there were arguments made that it should only apply where the employee is somehow running afoul of the religious interest of his or her employer, and that if it's a sort of garden variety employment case, it shouldn't apply. But that is not how Senator Tabor, for example, decided that issue. The question is... Your answer is it doesn't. No, in fact, Ms. Palmer was quite effectively carrying out the religious mission of the university. That's part of the evidence that she was... Wasn't fired because she wasn't carrying out the religious mission. That's right, Your Honor. And our position is that that is fine under the ministerial exception, because the ministerial exception is about, is she a minister or isn't she? And if she is, then she does not get to avail herself of employment laws when the university, the religious institution, makes a selection. I see I'm out of time, and so I'll address the rest on my reserve. Thank you very much. We appreciate it. You saved some time, too. Mr. Hawkins? Yes, sir. We're back to you. Thank you, Your Honors. And I hate to be the bearer of bad news, but I think you are going to have to deal with the constitutional question. At least that's our position, because it's our position... Assume for a minute that that's wrong, that maybe we could do both. I understand this is a hard place for you, but Ashwander is obviously one of our cases that we rely on heavily. Do you agree it's a prudential rule? It's not like a requirement that we do. It's prudential? It is, it is. And that courts, the Supreme Court, sort of repeatedly has said, where there's a good reason to deviate, then that is a permissible course. In fact, the Supreme Court does deviate from that. Correct. And so what I want to get, I want to make sure the framework was there, but then what I want to get at is why wouldn't, you know, the language from Our Lady of Guadalupe about, you know, staying out of employment disputes and Hosanna Tabor, you know, not second-guessing that, you know, courts have no warrant to second-guess these decisions. Why wouldn't those indicate that if we are faced with a choice, we ought to stay out of these employment decisions, exactly as the Supreme Court has said? Well, I have several responses to that. I'll start by saying your opening premise reminds me of Judge Easterbrook's comments in the Starkey concurrence, in the Starkey case that was recently decided out of the Seventh Circuit. And he expressed concern that courts were jumping to the ministerial exception first and dealing with non-ministerial exception issues later for precisely the constitutional avoidance reasons that you've raised. The question then is, like, if the ADA claim was easy, right, if your claim was really weak, right, well, I mean, I'm totally with you, right? And so I got that. The angst is that the way you've presented the claim really requires us to second-guess, like, at a pretext level, a religious institution's employment decision, right? We have to say, you know, in order to, you know, agree with you on the ADA claim, we have to say this religious institution, it is reasonable for a jury to determine that they are liars, right, that they are dishonest in their dealings. And that puts us squarely, it seems like to me, in contravention of the Supreme Court, saying that we are bound to stay out of employment disputes. Judges have no warrant to second-guess those judgments. I mean, that feels like something that we ought not to do unless we have no other option. Well, I don't think you have another option. And I will tell you that if what you're espousing as a potential rule of law, if that were, in fact, the guiding standard, then that's exactly what they would have said in Hosanna Tabor and Morrissey Beru. Because every employment case, whether it involves a minister or not, involving a religious institution, involves some sort of unlawful activity. Age discrimination is unlawful. You know, sex discrimination is unlawful. Why would they have said, I mean, they did say, I mean, they said bound to stay out of employment disputes. No warrant to second-guess. Or ministers. Well, correct. Well, and that's the point. And so my point to you, Your Honor.  It's just a question of what is the order of decision. If you have a hard ADA claim, which requires us to second-guess employment decisions, right, which requires us to get into their employment disputes, that is really difficult. We ought to default to the much easier, hypothetically, ministerial exception. Perhaps. Perhaps. Again, I think we're talking a little bit in academics. No, no, of course. What we're dealing with here. I have a tendency to do that. I'm sorry. No apologies necessary, Your Honor. What we have here is somebody who is clearly not a minister. And I think that resolves the issue so that you have to resolve both questions. This Court has to say, at least from our position, has to say that there's a genuine issue of material fact as to whether or not age was a motivator, or not a motivator, but for causation of Eva Palmer's termination. And that in order for that proceeding to go forward, you have to say that the affirmative defense of a ministerial exception does not apply in this case. And I think you can say that. And I think Judge Moon got that point right. Is that a legal issue or a factual issue? On this record, I believe it is a legal issue. It's our position that Judge Moon could say as a matter of law that she was not a minister. And it's our position that if the words of key roles and important positions and teaching the faith and messenger of the faith from Morrissey Beru are to have any meaning whatsoever, then they must mean that somebody must meet all three of those criteria in order to be a minister. And Eva Palmer meets none of those criteria. Wait, I'm sorry. Say that one more time. Your position is that that list is in order to be a minister, you have to be all three of those things? You have to be in an important position and or playing a key role. I think that can be interchangeable. But you must be a teacher or messenger of the faith. You cannot simply be somebody who's not right. But you let off the list of three, like a minister or whatever. And then you said you have to be all three. And that's plainly not true. You don't have to be an ordained minister in order to be a messenger of the faith. You do not. But you have to be in a key role at the institution. You have to be. And perhaps it's redundant. The key role is being a messenger, right? What our Lady of Guadalupe says is that the key role is being a messenger of faith. That is defining what a key role is. I think that may be correct. I think I'm not trying to go too far. But I think the point that I'm making, though, is that the use of the words important and key mean that it can't be everybody at the institution. Everybody at the institution, if they were. No, but I think we would say if you go into the Catholic church, you go to the local diocese, like everybody in the local diocese is a minister of faith. That may be true. Right? So it's not that you can't have everybody in an organization be a key person in the sense that they are a messenger of the faith. Right. There are some organizations that that's all they do, right? This isn't a rank order where you only get 50 percent can qualify, right? I think that is correct. There's no limitation on how many people at one particular institution can or cannot be a minister. But I think the way that the court has analyzed the issue is that it does focus on important people, and important people are messengers or teachers of the faith. So to very briefly say, the teachers in Morrissey-Beru and in Hosanna-Tabor were messengers of the faith. They taught from biblical texts. They taught students about the sacraments. They taught them how to believe. They taught them how to worship. They tested them on those issues. Eva Palmer did none of those things. She taught drawing. She taught painting. Her students learned how to do curvilinear and rectilinear changes. They learned how to draw lines. They were never tested on anything religious. And so for all of those reasons, as we've explained in our papers, she's not a minister. I want to close by saying what I think is the most important piece of this, which is that as we sit here today, no court of last resort, no state court of last resort, and no federal court of appeals has ever held that a teacher at any institution, at any religious institution, who has never taught religion or theology or doctrine or faith to their students is a minister. And this court should not be the first. We ask that the decision be deferred. Thank you. Thank you, Mr. Hawkins. We appreciate it. Mr. Tower? Thank you, Your Honor. Can you start with responding to that suggestion that there's a per se bar to considering a teacher a minister if they don't teach a class that is labeled separately religion or doctrine? I think that just runs— Or if they haven't proselytized at all. I mean, I thought that was included in the hypothetical. Well, and I don't understand that to be a limitation that the plaintiff puts on this, but I think the evidence is that Ms. Palmer has prayed with students and— In fact, prayed with students at the start of every class. And I think, more importantly, has incorporated a Christian worldview into—as she was expected to do and was evaluated on how she would do very well. She did very well at this, incorporating a Christian worldview into the material of the class. And art, obviously, is a course where this comes naturally. There's thousands of years of religious art. There is a reported case on a music director that I think is very similar in the sense that this is part of religion just in the same way as teaching from a text would be. And so there's— She has a syllabus? Where in your syllabus is that reflected? I don't believe it's in her syllabus, other than in the general expectation that she is going to model this behavior. And she has in her promotional materials— So it is not stated exactly what she is to do in specific in the job-related materials at Liberty. What she is given is the more general directive of, you need to incorporate your Christian worldview into the classroom. There is training available from their Center on Teaching Excellence on this, and she gets the chance to do that. And so our view is that nothing in Our Lady of Guadalupe says, well, you have to be teaching some particular text or else you're not a minister. In fact, I think the lesson of Our Lady is actually just the opposite. It's that you need to look at, is this a key role? Is this a role where this person is advancing the religious mission of the institution? And at least in the teaching context, we can say the answer is yes. It may be true that not everyone, unlike the diocese, not everyone at a university is going to be covered by the doctrine. We don't have to decide that today. We're not even asking for a categorical all-faculty today. But this art teacher, where the record of her teaching in a way that incorporated her Christian worldview into the classroom, we suggest that you find does meet the ministerial exception, and that that is within— We agree with you on the ADA claim. Would your position with respect to the other claim be asking us for an advisory opinion? Well, I would agree that you would not need to necessarily decide the decision, the ministerial exception issue at that point. And our request that you exercise your ability to do that is based on what was being referred to earlier, that Ashwander is prudential, that there is a real judicial economy when someone's status itself causes them not to be—the suit not to be amenable, as opposed to a potentially messy set of facts of, you know, is there a protected class that's being relied upon? Is there a legitimate reason? All of the things that come along with your normal employment case. When that one yes or no status question would resolve the issue, we think that the district courts ought to be able to reach those first. And so we think that your decision giving them guidance on both of these issues would be important in that regard. Your Honors, I did just want to address one or two other things that came up. The Plaintiff's Counsel indicated that one of the reasons that they believe that this case is not well taken is that there was not a specific threat essentially made to Ms. Palmer that if you don't gain these skills, you will be discharged in some sense. And I think that that's just nowhere in the case law that there's an obligation on the or else they can't rely on a fact or it's not a legitimate, non-discriminatory reason if there's not some specific communication of that type of warning. So I think that years of telling an employee, this is what we expect of you, this is what we need you to do, and having them, by concession in argument today, not achieve that goal, that's a legitimate reason for— When they promoted her, did they once again say, we want you to get this digital stuff under your belt? I don't think they made that in simultaneously, you know, you're promoted but you still need to work on this. And maybe that is something they should have said, but I don't think it wipes the slate clean and takes that issue off the table. And so for those reasons, Your Honor, we think you should affirm the district judge on the ADEA issue and we would specifically ask that you not only reverse the grant of summary judgment to Ms. Palmer on the ministerial exception issue, that obviously one option you have is to simply reverse that and send it to the jury effectively, but we ask that you reverse the denial of summary judgment for Liberty as well on that issue. Thank you very much, Mr. Tower. We appreciate it. We appreciate both counsels, counsel on both sides.
judges: Robert B. King, Julius N. Richardson, Diana Gribbon Motz